IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 14-cv-01213-RBJ

STEPHEN E. FLECHNER,

    Plaintiff,

v.

STANDARD METALS PROCESSING, INC., f/k/a Standard Gold, Inc., a Nevada corporation,

    Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF JUDGMENT

This case was tried to the Court on July 29, 2015.

### I. FINDINGS OF FACT

1. In 2010 Standard Metals Processing, Inc.'s predecessor, Standard Gold, Inc., was a start-up company headquartered in Colorado with its principal place of business in Denver. Standard Gold was formed to acquire and develop gold exploration properties.

2. In order to attract and retain key employees, consultants and directors, the Board of Directors of Standard Gold adopted a "2010 Stock Incentive Plan" on March 22, 2010. Ex. 3. Three million authorized but unissued shares of the company's common stock were reserved for potential issuance pursuant to the 2010 Stock Incentive Plan.

3. Stephen E. Flechner began his career as a corporate lawyer in New York specializing in securities law. After several years, both in private law firms and as in-house counsel to public companies, he developed an expertise in the exploration and mining of gold.

4. Mr. Flechner's work as a consultant in gold exploration came to the attention of Standard Gold's controlling stockholder and Chief Executive Officer, Stephen King, and on April 1, 2010 Mr. Flechner was hired to be the President of Standard Gold. The terms of the engagement are set forth in an Employment Agreement of the same date. Ex. 1.

4. On the day he was hired, the company also entered into a Stock Option Agreement with Mr. Flechner whereunder he was granted options to purchase up to 800,000 shares of the company's common shares at an exercise price of $0.90 a share. Ex. 2. The grant of options was made pursuant to the 2010 Stock Incentive Plan. Subject to certain vesting requirements not at issue in the present case, the shares would be valued at their fair market value on the date the option is exercised. Ex.3 at ¶6.4.

5. In November or December 2010 Standard Gold began discussions with Shea Mining and Milling LLC about a possible acquisition of certain assets held by Shea, including in particular assets in Nevada.

6. From January 9 through January 11, 2011, Mr. Flechner and others were in Nevada performing a "due diligence" inspection and evaluation of Shea's assets.

7. On January 21, 2011 Standard Gold's Board of Directors voted to increase the number of options available under the 2010 Stock Incentive Plan from 3,000,000 to 13,500,000 shares. Minutes, ECF No. 11-1 at 14 (filed in the present case as an exhibit to a complaint filed by Standard Metals against Mr. Flechner in state court in Alabama, discussed *infra*).

8. In the same meeting the Board granted 6,000,000 additional options to Mr. King, Mr. Flechner, and three other individuals. Mr. Flechner received options to purchase 750,000 additional shares of the company's common stock at an exercise price of $0.51 per share. Ex. 4.

9. Mr. Flechner attended the January 21, 2011 Board of Directors meeting by telephone, but he was not a member the Board. He did not participate in the decision to increase the number of options available under the 2010 Stock Incentive Plan.

10. On March 15, 2011 Standard Gold completed the acquisition of assets from Shea Mining & Milling LLC. In exchange for the assets Standard Gold issued common stock to the equity holders of Shea Mining & Milling LLC, resulting in those holders owning a controlling interest in Standard Gold.

11. Mr. Flechner's employment by Standard Gold ended effective May 19, 2011, as embodied in a Separation Agreement dated June 1, 2011. Ex. 6. The Separation Agreement contains a clause acknowledging that, notwithstanding the termination of his employment, he could exercise his options under both the April 1, 2010 and the January 21, 2011 Stock Option Agreements for a period of three years thereafter. *Id.* at ¶1(c).

12. On June 6, 2011 Mr. Flechner exercised 10,000 of the options granted on January 21, 2011 at $0.51 per share. On June 30, 2011 he exercised 20,000 of the options granted on January 21, 2011 at $0.51 per share. Ex. 9. There was no dispute about these two exercises, totaling 30,000 shares, from the new management of the company.

13. In December 2012 Standard Gold's name was changed to Standard Gold Holdings, Inc., and it relocated its principal place of business to Gadsden, Alabama.

14. On or about March 1, 2013, the company changed its name to Standard Metals Processing, Inc., and it changed its state of incorporation to Nevada.[1]

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

15. On February 26, 2014 Mr. Flechner notified Standard Metals that he was exercising 310,000 of the options granted on January 21, 2011 at $0.51 per share. Ex. 7. The closing price of Standard Metals shares on February 26, 2014 (OCTQB) was $1.95 per share. Exs. 11, 12. Standard Metals has not honored the February 26, 2014 exercise.

16. On March 19, 2014 Mr. Flechner notified Standard Metals that he was exercising 100,000 of the April 1, 2010 options at $0.90 per share. Ex. 8. The closing price of Standard Metals shares on March 19, 2014 was $2.20 per share. Exs. 11, 12. Standard Metals has not honored the March 19, 2010 exercise.

17. On April 1, 2014 Mr. Flechner notified Standard Metals that he was exercising 410,000 of the January 21, 2011 options at $0.51 per share and 700,000 of the April 1, 2010 options at $0.90 per share, thus completing his exercise or attempted exercise of all of the options he had been granted. The closing price of Standard Metals shares on April 1, 2014 was $2.18 per share. Standard Metals has not honored the April 1, 2014 exercise.

18. On April 21, 2014 Standard Metals filed a lawsuit against Mr. Flechner and unnamed others in the Circuit Court of Etowah County, Alabama. In its Complaint Standard Metals sought a judgment (1) declaring that the January 21, 2011 amendment to the Stock Incentive Plan was invalid because it lacked shareholder approval; (2) rescinding all stock option awards granted on that date; and (3) declaring that Mr. Flechner could only exercise 5,619 of the 800,000 options he was granted on April 1, 2010 (his pro rata share of what was alleged to be 200,000 available shares). ECF No. 11-1 at 4-5.

19. In the Alabama suit Standard Metals alleged that the 2010 Stock Incentive Plan in its original form contained the following paragraph:

> 9.11. <u>Amendment of the Plan</u>. The Board of Directors may amend or discontinue the plan at any time. However, no such amendment or discontinuance shall adversely change or impair, without the consent of the recipient, an Incentive previously provided. Further, no amendment shall, *without approval of the stockholders of the Company*, (a) increase the maximum number of shares of Common Stock which may be issued to all participants under the Plan, (b) change or expand the types of incentives that may be granted under the Plan, (c) change the class of persons eligible to receive Incentives under the Plan, or (d) materially increase the benefits accruing to participants in the Plan.

ECF No. 11-1 at 23 (emphasis added).

20. Minutes of a meeting of the Board of Directors of Standard Gold held on March 22, 2010 indicate that the Board approved a version of the 2010 Stock Incentive Plan attached as "Exhibit A." Ex. B at 1. The version of the Plan attached to Standard Metals' Alabama complaint is not dated but has the typed label, "EXHIBIT A." ECF No. 11-1 at 16. Coincidentally, a copy of the same document was admitted as Ex. A in the present case. This version contained paragraph 9.11 in the form quoted in paragraph 19 above. Ex. B.

21. Standard Metals alleged that the shareholders of Standard Gold had not approved the increase in the number of options available from 3,000,000 to 13,500,000 shares that was approved by the Board on January 21, 2011, and therefore, the increase was void and of no effect, as was the award to Mr. Flechner of 750,000 options from the increased number of available options. *Id.* at ¶¶7–11. The Complaint states that Standard Metals' proposal to divide the 200,000 options remaining prior to the January 21, 2011 Board action pro rata among the individuals awarded options on that date was "a corrective measure designed to be fair to all those issued options on January 21, 2011." *Id.* at ¶12.

22. Mr. Flechner filed the present suit in this Court on April 29, 2014. It asserts five claims for relief: (1) breach of the Stock Option Agreements; (2) breach of the Separation

Agreement; (3) promissory estoppel; (4) unjust enrichment; and (5) declaratory judgment. ECF No. 1 at 7–10. Setting aside the multiplicity of claims, the essence of it is that Mr. Flechner was properly awarded a total of 1,550,000 options; that he had properly exercised or attempted to exercise those options; that Standard Metals had wrongfully failed to honor all but 30,000 of the options; and that the Court should enter a declaratory judgment requiring that Standard Metals honor its obligations. ECF No. 1.

23. Mr. Flechner removed the Alabama case to federal court, where it was eventually dismissed for lack of personal jurisdiction over him. However, at least until the parties to this case entered into a partial settlement agreement, discussed below, Standard Metal's defense in the present case was similarly based on its contention that the Standard Gold Board improperly increased the number of options at its January 21, 2011 Board meeting, because it did not have shareholder approval.

24. Standard Gold was represented at that time by the law firm of Maslon Edelman Borman & Brand, LLP of Minneapolis, Minnesota. At some point an attorney from that law firm changed the language of paragraph 9:11 of the 2010 Stock Incentive Agreement, inserting the words "if the Plan has been approved by the stockholders." That paragraph then read as follows:

> 9.11. <u>Amendment of the Plan</u>. The Board of Directors may amend or discontinue the plan at any time. However, no such amendment or discontinuance shall adversely change or impair, without the consent of the recipient, an Incentive previously provided. Further, no amendment shall, without approval of the stockholders of the Company *if the Plan has been approved by the stockholders*, (a) increase the maximum number of shares of Common Stock which may be issued to all participants under the Plan, (b) change or expand the types of incentives that may be granted under the Plan, (c) change the class of persons eligible to receive Incentives under the Plan, or (d) materially increase the benefits accruing to participants in the Plan.

Ex. 3 (emphasis added).

25. The Court cannot determine exactly when this change was made from the evidence in the record. However, it had to have been made before April 2, 2010, because on that date an attorney in the law firm, Ranga Nutakki, sent an email to Mr. Flechner and Mr. King, with a copy to Mark Dacko, the Chief Financial Officer of Standard Gold, in which he informed them that he had made this "technical change." Ex. G. Mr. King responded by asking what the change did. Mr. Nutakki explained that without the change, the shareholders would have to approve amendments to the plan even though they hadn't had the opportunity to approve the Plan itself. *Id.* Mr. King forwarded Mr. Nutakki's explanation to Mr. Flechner, adding that he felt it was a moot point because "we 'control' any required shareholder approval anyway." *Id.*

26. The Court finds based upon a preponderance of the evidence that the version of paragraph 9.11 of the 2010 Stock Incentive Plan that was voted on by the Board on March 22, 2010 probably did not have the language added by Mr. Nutakki. Mr. Nutakki then caught what he thought was a potential issue with paragraph 9.11, i.e., that as first written any amendment to the 2010 Stock Incentive Plan would have to be approved by the shareholders, even though the Plan itself had not been put to a vote of the shareholders.

27. There is no evidence in the record indicating that the revised version was put to a vote of the Board. However, the revised version was filed with the United States Securities and Exchange Commission as an exhibit to Standard Gold's Form 8-K report dated April 5, 2010. Ex. 15.

28. The same version of paragraph 9.11 is contained in the 2010 Stock Incentive Plan, as amended, that was filed with the SEC on January 27, 2011 as an exhibit to Standard Gold's Form

S-8 registration statement that registered 13,500,000 share of common stock. Ex. 16. The registration statement indicates that it was signed by four of Standard Gold's five Directors, one of whom was also the Chief Executive Officer, as well as by the Chief Financial Officer. *Id.* at 5. Another exhibit to the registration statement is the legal opinion of Maslon Edelman Borman & Brand, LLP, that "when issued and paid for as contemplated by the Plan, and when delivered against payment thereof in the manner contemplated by the Plan, [the stock] will be validly issued, fully paid, and non-assessable. *Id.*, Exhibit 5.1.

29. On December 9, 2014 the parties to the present case entered into a Confidential Agreement to Settle Certain Terms. Ex. 10. A key term is that, for purposes of this case only, Standard Metals "agrees not to contest the validity and exercise of the stock options Flechner has put at issue" in the case. *Id.* at ¶1. The agreement explains that while Standard Metals does not admit or stipulate to any facts concerning Mr. Flechner's options, it was agreeing to this because of "the cost, case schedule, and uncertainty of litigating the validity and exercise" of the options. *Id.* The parties retained "the right to litigate or otherwise resolve the value" of the options. *Id.* at ¶3.

30. Sharon Ullman, the then President of Standard Metals, consulted with the company's then outside counsel, Tarek F. M. Saad of Squire Patton Boggs (US) LLP, concerning the settlement agreement. The agreement states that it was approved as to form and substance by counsel, although Mr. Saad did not actually sign the agreement. In any event, after signing the agreement Ms. Ullman consulted with Standard Metals' present counsel who apparently advised her that it was not a good idea. Based on that advice Ms. Ullman instructed Mr. Saad not to deliver the signed agreement to Mr. Flechner. However, he had already done so. Standard

Metals did nothing further at that time, and Mr. Flechner performed his obligation under the settlement agreement to cancel a Rule 30(b)(6) deposition that had been scheduled. Later, perhaps during the course of an unsuccessful mediation in which the parties participated on January 6, 2015, Standard Metals apparently gave some indication to Mr. Flechner that it did not consider the settlement agreement to be binding. He filed a motion to enforce the settlement agreement. ECF No. 43. Standard Metals opposed the motion and, claiming that the settlement agreement was only intended to facilitate settlement negotiations, asked the Court to annul it. ECF No. 45 at 2.

31. Initially, and mistakenly, the Court by minute order denied the motion to enforce, finding that there were genuine issues of material facts that were in dispute. ECF No. 66. However, following plaintiff's motion to reconsider that order, which was fully briefed [ECF Nos. 72, 74 and 75], the Court advised counsel during the course of a trial preparation conference on May 1, 2015 that the motion to reconsider was granted. In a minute order of the same date the Court ordered that the settlement "is enforceable and is to be complied with." ECF No. 76.

## CONCLUSIONS OF LAW

In the April 1, 2010 Stock Option Agreement Standard Gold granted Mr. Flechner options to purchase 800,000 of the company's stock. In the January 21, 2011 Stock Option Agreement Standard Gold granted Mr. Flechner options to purchase 750,000 shares of the company's stock. It is undisputed that he has exercised his options according to the terms and requirements of the two agreements. Other than the 30,000 shares that he was permitted to purchase on the terms of the January 21, 2011 agreement in June 2011, Standard Metals

Processing, Inc. (the same company under a different name) has failed to honor its obligation to him under both contracts.

The defense argues that the options are not valid and cannot be exercised, at least to the extent that they exceed Mr. Flechner's pro rata share of the remainder of the 3,000,000 shares that were available prior to the January 21, 2011 Board meeting. This would largely eliminate his options. The argument, crafted by new counsel on behalf of the new owners of the company, turns on the company's ability to convince a court that the version of the 2010 Stock Incentive Plan that was first submitted to and approved by the Board of Standard Gold continues in effect. Paragraph 9.11 of the original version requires shareholder approval of any amendment to the Stock Incentive Plan and arguably might block an increase in the number of shares available for the exercise of options.

On the other side, paragraph 9.11 was almost immediately modified; the modified version is the official version filed with the SEC with the implicit if not explicit approval of the Board; the Board again approved the amended 2010 Stock Incentive Plan with the revised paragraph 9.11 in it at its January 21, 2011 Board meeting when it also approved the increase in the number of shares; and outside counsel provided a legal opinion of the validity of the issuance of the additional shares.

However, this tug of war between the old and new owners of the company need not be resolved in the present case. In the first place, as noted above, Mr. Flechner's Separation Agreement confirmed his right to exercise all of his options. This agreement was executed after the new ownership of the company was in place. Shortly thereafter the company honored his exercise of 30,000 shares of the January 21, 2011 options. Those actions at least implicitly

recognized vis-à-vis Mr. Flechner that the increased pool of shares from which the options would be exercised was validly created. Even more importantly, the settlement agreement executed by the parties during the course of this case expressly and clearly set forth Standard Metals' agreement not to contest the validity and exercise of Mr. Flechner's options. They also agreed that the only remaining issue in this case is "determining the value of the case and cashless exercises of the Flechner Options." Ex. 10 at 2.

Management of the company, on advice of different counsel than the counsel who negotiated and approved the settlement agreement, changed its mind on the desirability of the settlement. But there is a big difference between buyer's remorse and reneging on a deal. Despite the clear terms of the settlement agreement, and this Court's determination that the settlement agreement was enforceable, Standard Metals stubbornly continued to argue that the settlement agreement should not be enforced.

Defense counsel candidly acknowledged during trial that the only thing he could think of that might do his client's bidding was an argument based on the last sentence of the agreement. That sentence reads, "If a full and final settlement is not reached before the close of business on January 7, 2015, then the Court in the Lawsuit will be advised that the remaining issue to be tried is determining the relief, *if any*, to be awarded." Ex. 10 at ¶7 (emphasis added). The words "if any," argues Standard Metals, allow for the possibility that no relief would be awarded at trial. From this precarious toehold Standard Metals proposes that Mr. Flechner's "unclean hands" and "breach of fiduciary duty" provide a legal basis to deny relief.[2]

---

[2] Counsel volunteered that the unclean hands argument applies only to plaintiff's unjust enrichment claim.

In the first place this is an entirely implausible reading of the settlement agreement. The parties' intent, as plainly documented in the agreement, was to terminate discovery and the continuing expense and uncertainty of litigating the validity and exercisability of Mr. Flechner's options. Moreover, this Court before trial upheld the enforceability of the settlement agreement and ordered Standard Metals to comply with it. Its attempt at trial to squeeze a loophole out of the innocent words, "if any," is not my idea of compliance.

In addition, the evidence does not support the notion that Mr. Flechner engaged in conduct that even arguably could constitute unclean hands or a breach of fiduciary duty. He was offered the first 800,000 options as part of the package that induced him to accept the company's presidency. He had nothing to do with the drafting of the 2010 Stock Incentive Plan. The modification of paragraph 9.11 occurred, at the latest, on the day after he began his employment. There is no evidence that he even knew of it before receiving attorney Nutakki's email of April 2, 2010.

Nor is there any evidence that Mr. Flechner was a motivating force behind the option grants of January 21, 2011. According to the minutes of the meeting, the Board voted Mr. King 3,500,000 options; another Director and Mr. Flechner 750,000 options; Mr. Dacko and another individual 500,000 options. ECF No. 11-1 at 14. Mr. Flechner was not a member of the Board, and he had no vote, although he was present at the meeting by telephone. It might be reasonable to infer that the Board was taking care of the existing regime on its way out. That does not, however, prove that the options had not been earned. With particular reference to Mr. Flechner, there was nothing in the evidence to suggest that the grant of additional options to him was not reasonable or deserved. The fact that the validity of the options was recognized by the new

regime in his Separation Agreement, and that his first exercise of January 21, 2011 shares was honored, suggests the contrary.

The Court concludes that Standard Metals' failure to honor Mr. Flechner's exercises of his options granted under the April 1, 2010 Stock Option Agreement and (except for 30,000 shares) the January 21, 2011 Stock Option Agreement was a breach of those agreements.

The value of the options is not mysterious. Paragraph 6.4(b) of the 2010 Stock Incentive Plan (all versions) provides that, unless otherwise provided (which it was not), the shares "shall be valued for this purpose at the Fair Market Value on the date such option is exercised." Exs. 3 and 5, ¶6.4; Ex. 5 ¶6.4(b). Paragraph 9.14(a) of the 2010 Stock Incentive Plan (all versions) provides that "[i]f such shares are listed on a U.S. securities exchange, then Fair Market Value shall be determined by reference to the last sale price of a share of Common Stock on such U.S. securities exchange on the applicable date." Ex. 3 and Ex. 5, ¶9.14(a).[3] The evidence established, and it is not disputed, that Standard Metals shares were listed on a U.S. securities exchange.

Mr. Flechner's options on the date of exercise had value as follows:

- 2/26/14:   310,000 shares @ $1.95 – 310,000 shares @ $0.51 = $446,400
- 3/19/14    100,000 shares @ $2.20 – 100,000 shares @ $0.90 = $130,000
- 4/1/14     410,000 shares @ $2.18 – 410,000 shares @ $0.51 = $684,700
- 4/1/14     700,000 shares @ $2.18 – 700,000 shares @ $0.90 = $896,000

**TOTAL:**                                                                                         **$2,157,000**

---

[3] Paragraph 9.14(c) of the January 21, 2011 version of the 2010 Stock Incentive Plan provides that, "Notwithstanding subsections (a) and (b) above, if such shares are publicly traded, then Fair Market Value may, at the discretion of the Committee, be equal to the average of the closing sale price of the Company's Common Stock for the thirty (3) calendar days prior to the Grant Date of the applicable Incentive." The earlier version(s) did not contain that paragraph. The "Committee" is a stock option or compensation committee of the Board. *Id.* ¶2.1. However, there was no evidence that the Committee ever exercised this discretion.

Accordingly, on his breach of contract claim, plaintiff is entitled to damages in the amount of $2,157,000.

## ORDER

1. The Court directs that judgment be entered in favor of the plaintiff, Stephen E. Flechner, and against the defendant, Standard Metals Processing, Inc. on plaintiff's First Claim for Relief in the amount of $2,157,000.

2. The Court finds that plaintiff's Second, Third, Fourth and Fifth Claims for relief are moot.

3. Plaintiff is entitled to prejudgment interest pursuant to C.R.S. § 5-12-102 in an amount to be agreed by the parties or determined by the Court.

4. As the prevailing party plaintiff is entitled to costs pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure and D.C.COLO.LCivR 54.1.

DATED this 12th day of August, 2015.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge